## CAMP *vs.* SIMMONS.

[WARNER, Chief Justice, was providentially prevented from presiding in this case.]

1. Where a sight draft, payable generally to the order of a named person, was drawn by a corporation on itself, and by itself accepted, and was indorsed in blank by several persons, and suit thereon was brought by the executors of the payee against the corporation as principal and the others as indorsers, (the payee himself never having indorsed the instrument, so as to take the position of first indorser,) and judgment was rendered in behalf of the executors against the defendants, and execution issued accordingly, the so-called indorsers, though described as such in the declaration, judgment and execution, were not such technically or substantially, but under the act of 1826 (Cobb's Dig. 594), were sureties for the corporation to the payee. They were denominated indorsers in a loose, not in a strict sense, and the misdescription is, after judgment, immaterial, since their true character is apparent on the face of the record.
2. Though the draft was drawn, accepted and indorsed prior to the Code, parol evidence is admissible in a contest between the so-called indorsers, to show their actual relation to one another and to the consideration of the draft. The parol evidence which was adduced corroborates and confirms their apparent relation, and leaves them liable to contribution as co-sureties.
3. One of them having paid off the execution, and having had the fact of payment properly entered on the same, he is entitled to control the judgment and execution as provided for in sections 2167 and 2170 of the Code.

Negotiable instruments. Indorsement. Principal and security. Contribution. Evidence. Before Judge RICE. Gwinnett Superior Court. March Term, 1878.

An execution in favor of the executors of William Maltbie, proceeding for the use of Merit Camp, against the Gwinnett Manufacturing Company as principal, and Enoch

Steadman, Merit Camp, and James P. Simmons as indorsers, was levied upon certain land as the property of the defend-ant Simmons. He filed an affidavit of illegality substan-tially as follows:

1st. Because the execution was issued against the Gwin-nett Manufacturing Company as principal, and Steadman, Camp and deponent as indorsers, and in the order named; that it appears from entries on the *fi. fa.* that it has been fully paid off by indorsers prior to this deponent.

2nd. Because the judgment upon which said execution is based, was recovered on a draft or order drawn by said Steadman as the agent of said company, upon N. P. Hotch-kiss as treasurer, in favor of said Maltbie, dated January 22nd, 1862, and accepted by said treasurer; that this instru-ment was given for money borrowed for the use of the company. That previous to this time deponent had sold most of his stock in the company, and on January 27, 1862, disposed of the balance, subsequent to which Hotchkiss, Steadman, Camp and a few others owned all the property. That in view of these facts, and without regard to the form of the security given, the parties aforesaid became legally liable and bound to deponent to pay said debt and to save him harmless; that deponent, after he ceased to be a stock-holder in said company, became but a surety for the par-ties aforesaid.

3rd. Because the individual stockholders signing the in-strument sued on, would become liable for the payment of the amount thereby secured in the order of their signa-tures as between themselves; that to secure said stock-holders from loss the treasurer of the company indorsed first and the agent second, so as to insure its payment out of the funds of the company which they had in their control

To this affidavit a traverse was filed by Camp, setting forth the history of the execution of the instrument sued on, that he had paid it off as surety, etc., and insisting that he and Simmons were both sureties technically speaking, and not indorsers.

Upon the issue thus formed, the pleadings and evidence presented the following case :

The Gwinnett Manufacturing Company, a corporation, being in need of money, and its officers having discovered that $2,500.00 could be borrowed from Maltbie if personal security were given, its president, Simmons, directed its agent, Steadman, to draw on its treasurer, Hotchkiss, in the following manner :

"$2,500.00. OFFICE GWINNETT MANUFACTURING COMPANY,
Lawrenceville, Ga., January 22, 1862.

At sight pay to the order of Wiliam Maltbie two thousand five hundollars for cash, at 7 per ct.

To N. P. HOTCHKISS, Treasurer.

(Signed.) E. STEADMAN, Agent."

This draft was duly accepted by the drawee. It was then indorsed by Hotchkiss, Steadman, Camp and Simmons. In this condition it was delivered to Maltbie, who advanced the money thereon as a loan to the corporation. Simmons testifies that he directed the paper to be made in this shape, Hotchkiss and Steadman being first indorsers and men of means, to secure its being paid out of the funds of the company then in their control; that he never contemplated assuming any other liability beyond that of last indorser. Camp testifies that his understanding was, at the time he signed, that the object of the paper's being in that shape was to give credit to the company, and that no one placing his name on the back assumed any greater or less liability than the other; that he never heard of any such claim until he was so informed by Simmons after suit commenced.

The draft not being paid, after the death of Maltbie, on August 8, 1868, his executors brought complaint against the company as principal, and Hotchkiss, Steadman, Camp and Simmons as indorsers. Simmons, as attorney for the defendants, filed pleas, etc. At March term, 1869, he confessed judgment for all of the defendants except Hotchkiss (he having become a bankrupt) for $2,500.00, principal, and $52.15 interest to judgment. On this confession, a formal

6

judgment was entered against the company as principal and the other defendants as indorsers.    Execution issued in the same form as to the character of the parties as had been observed in the declaration and judgment.   It was levied upon the property of Camp, who at different times during the years 1874, 1875 and 1876, made payments thereon to the plaintiffs' attorneys until the entire debt to them was satisfied.   The fact of payment by Camp was entered by the plaintiffs' attorneys on the execution.   After the judgment Steadman became bankrupt, and on June 1, 1876, Murray, the register in bankruptcy, paid to Camp, out of the assets of Steadman's estate, $1,092.67, the same being one-third of the amount due on the execution at the time of the adjudication of bankruptcy.

The jury found the issue in favor of Simmons.   Whereupon Camp moved for a new trial upon the following grounds, to-wit:

1. Because the court erred in admitting the testimony of Simmons, to the effect that he suggested to, and directed, Steadman, the agent, to draw the paper in its present form, for the purpose of having the agent and treasurer, in their individual capacities, first bound, so that they would see to its payment with the funds of the company, and thereby protect the other signers, it appearing that Camp was not present at the conversation between the witness and Stead-man.   Also, in allowing him to testify that he signed the draft with the intention of being liable as last indorser only.

2. Because the court erred in holding, under the facts of this case, that Steadman, Camp and Simmons were indorsers only, and not sureties, and thus that Camp was not entitled to contribution from Simmons.

3. Because the verdict was contrary to the law and the evidence.

The motion was overruled, and Camp excepted.

CLARK & PACE; N. L. HUTCHINS, for plaintiff in error, cited Byles on Bills, 69, 70, 144; Chitty on Bills, 284; 1st

Camp *vs.* Simmons.

Parsons on Con., 245; Code, §2773; 26th *Ga.*, 223; 4th *Ib.*, 266, 274, 275; 95th U. S., 90. Parties liable as original promissors, Story on Prom. Notes, §58; 2nd McMull., 313; 9th Verm., 345; 12th Verm., 219; 16th Verm., 554; Edwards on Bills (2 Ed.), 222; 13th Ohio, 228; 13th *Ga.*, 312; 2nd Hill, 663; 19th Pick., 260; 7th Gray, 284; 9th Cush., 104; 44th Maine, 433. Liable to contribution, Code, §§2173, 3132; 1st *Ga.*, 200; 38th *Ib.*, 512; 1st Par. on Contracts., 31; 1st Ohio, 413 Code, §§2756, 2170, 3599, 3082, 3562, 4213, 3491, *et seq.* Simmons' testimony inadmissible, 4th *Ga.*, 95; 1st Greenl. Ev., §277.

Winn & Simmons, for defendant, cited Code, §§2780, 2171; 1st *Ga.*, 205; 8th *Ib.*, 117; 7th John., 361; 8th Ala., 581; Code, §2151; 46th *Ga.*, 14. Conclusiveness of judgment, Code, §§3577, 3826, 2897; 1st Starkie's Ev., 228; Code, §§3491, 3494; Lapse of time, Code, §§2919, 4220. See 11th *Ga.*, 450; 25th *Ib.*, 696; Simmons' evidence admissible, Code, §§2757, 3773.

Bleckley, Justice.

A sight draft, drawn and accepted by a corporation (the corporation drawing by an agent, and accepting by its treasurer), bearing date January 22d, 1862, payable to the order of Maltbie, and indorsed in blank, before delivery, by the said agent and the said treasurer, each individually, and by Camp next, and last by Simmons, was given for money loaned by the payee to the corporation. The object of the transaction was to secure the payee for the loan of the money. He was not expected to indorse the draft so as to take the position of first indorser, he never did indorse it, but died possessed of it; and his representatives recovered judgment upon it against the corporation as principal, and three of the indorsers as such, Camp and Simmons included, in a suit begun in 1868 and ended in 1869. Upon this judgment execution issued against the principal and the

three so-called indorsers, the execution following the judgment in describing the parties. Camp paid it off, and had the fact of payment by him entered upon it by the attorneys of the plaintiffs. He then caused the execution to be levied on the property of Simmons, with a view to realize contribution from Simmons as his co-surety. Simmons resisted by affidavit of illegality.

1. Is the relation of Camp and Simmons that of indorsers, in the strict and proper sense, or that of co-sureties? This question finds an answer in the case of *Collins vs. Everett*, 4 *Ga.*, 266. In that case it was held that a promissory note made by Moore, payable to Everett or order, and indorsed by Collins, was a contract on which Collins was bound to Everett in the character of surety for Moore. The decision was put upon the act of 1826 (Cobb's Dig., 594), which act embraces drafts as well as notes, and was in force in 1862, and is therefore as applicable to the draft which Camp and Simmons indorsed, as it was to the instrument which was under consideration in *Collins vs. Everett* The differences between that instrument and the one with which we are now concerned are not essential differences. The former was a note, the latter a draft; the former had one indorser, the latter four. After acceptance, the acceptor of a draft or bill stands to the instrument in a relation corresponding to that of the maker of a note—1 Parsons on Notes and Bills, 54, 55. The draft, then, may be treated as a note made by the corporation, payable to the order of Maltbie, and indorsed before delivery to him by the four indorsers. If it had in fact been a note and indorsed by one only of these four, then it would have been almost exactly like the note in *Collins vs. Everett*. The differences, in that event, would have been reducible to these: the note in *Collins vs. Everett* was due at twelve months after its date, and was payable to Everett or order; the draft was due at sight, and was payable to the order of Maltbie. But in reference to any rule of law involved in the present inquiry,

such differences as these are of no moment whatever; whether a party to an instrument is strictly an indorser or not, is not dependent on the time of maturity, nor is it dependent on the verbal difference between A or order, and the order of A, in setting forth the payee; these two forms of connecting negotiable words with the payee's name are legally equivalent, each with the other. So, it may be affirmed that in every essential particular, were the draft a note with but one indorser, it would be so much like the note in *Collins vs. Everett* that the position of the indorser would be the same on both instruments. Now, the distinct ruling in *Collins vs. Everett* was, that the indorser was liable to the payee, not as indorser strictly, but as a surety for the maker. If a single indorser would be thus liable, can any reason be imagined why four indorsers would not be liable in the same way? And, certainly, if several persons are liable on one and the same contract as sureties, and only as sureties, their apparent relation among themselves is that of co-sureties. Our conclusion is, that *Collins vs. Everett* is an authority directly in point on the main question involved in the present case, and that it rules that question in favor of Mr. Camp, the plaintiff in error. Moreover, on principle, we are unable to perceive how the indorsers on the draft could be held liable to Maltbie, the payee, as indorsers strictly and properly. Any possible view of their position which would regard them as indorsers in a strict legal sense, would forever protect them against liability to the payee at all; for in order for them to be indorsers relatively to the payee, he would have to indorse the draft himself, or it would have to be considered as indorsed by him, in which case he would be a prior indorser, and they subsequent indorsers; and as a subsequent indorser is never bound to a prior indorser, but just the contrary, a prior indorser being bound to any subsequent one who takes up the paper, the result would be that, looking to the draft alone and the indorse-

ments thereon, the payee might become liable to them in case he negotiated the draft and they had it to pay, but they never could by any posssibility become liable to him. Whether the draft be considered as a note or as a bill is utterly immaterial; for the payee of either a note or a bill payable to his order, is always the first indorser, actual or prospective, where there are other indorsers on the instrument. It was for this reason that it was held in *Collins vs. Everett, supra*, that at common law Collins, the indorser of the note, was a second indorser, Everett, the payee, being prospectively the first. A further ruling made in that case, an inevitable corollary to the foregoing, was, that Collins was not liable to Everett, as indorser, at all. Had not the act of 1826 converted the so-called second indorser into a surety, thus radically changing what was deemed his common law attitude to the payee, Everett could never have recovered of Collins in that action, all parol evidence to fix the relations of the parties being excluded as inadmissible under the law as it then stood. There is no contract of indorsement between the indorser of a note or bill and the payee thereof; an indorser's contract is with the indorsee, and where there is no indorsee, no contract of indorsement is complete, and consequently no actionable liability as indorser is incurred. Neither in *Collins vs. Everett*, nor in the case now before us, was there any indorsee. In neither case could there have been any indorsee until the payee had himself indorsed the instrument; and in either case, if the payee had indorsed and negotiated the instrument, his indorsement would have infused life into the other indorsements, as such, and each indorsement would have become a complete contract of indorsement proper. Each indorsement is a separaté contract. 2 *Ga.*, 158. And, in contemplation of law, whether the indorsement by the payee be first or last in manual execution, it is always first in the series of contracts, and until it exists the others are inoperative as contracts of indorsement proper. By the doctrine of relation, when

the purposes of justice require the doctrine to be applied, the whole series may be referred back to the date of the instrument, or to the time when the earliest manual indorsement took place; but by no fiction can the legal order of the payee's indorsement as the first of the series be changed, or be considered as changed. His indorsement may be latest in execution, and last in position on the paper, but in legal contemplation it will be precedent to all the others; and he will incur the liabilities and have only the rights of a first indorser, relatively to the other indorsers considered as indorsers proper, and looking only to the instrument itself and its several indorsements. It is, however, needless for our present purposes to trace out the consequences of a supposed indorsement by the payee of the draft. The actual case is one in which no such indorsement took place, and similar in this respect was the case of *Collins and Everett.* It was urged upon us in argument, that though the action upon the draft was by the legal representatives of the payee, yet the action proceeded against the indorsers as such; that in that character were they sued, in that character was judgment rendered against them, and in that character were they charged in the execution, which issued upon the judgment, and which Camp paid off, and now seeks to control and enforce against Simmons. This being so, the conclusion sought to be established by the argument was, that, whether there was any contract of indorsement or not, was no longer an open question, that question having been adjudged when a suit against the indorsers terminated in a judgment against them as indorsers. But the whole record of that suit is before us, and upon the face of the same it is apparent, that the so-called indorsers, though described as such in the declaration, judgment and execution, were not such technically or substantially, but according to the act of 1826, were sureties for the corporation to the payee, and relatively to him could not have been indorsers proper. They were denominated indorsers in a loose, not in a strict

sense, and the misdescription is, after judgment, immaterial.
The state of the instrument sued upon, as the record of
the suit presents it, is more to be regarded than is the
nomenclature of the pleader in classifying the defen-
dants.    Calling them indorsers did not make them
so in a strict and proper sense.    Names often mislead
where the means of checking their indications are not
at hand, but here the means are at hand in the same record
in which the names are found.    At the same time the de-
fendants are called indorsers.    The reason why they are so
denominated is set forth in the pleadings by presenting a
copy of the instrument, and from that it is seen that, on the
principles stated above, they are not indorsers proper, but
sureties.    In 6 *Ga.*, 581, it was intimated that a bill in
equity entitled a bill in the nature of a bill of review, would
not take character from its improper title, rather than from
the allegations made in it.    In 17 *Ib.*, 187, it was held that a
*fi. fa.*, called in some of the proceedings an *alias fi. fa.*, was
nevertheless to be classed as an established copy, because its
contents showed it was that and not an *alias*.    See, also, 58
*Ib.*, 555.    In 18 *Ib.*, 492 a writ of *quia timet* was prayed
for, and the court thought this blunder in naming the rem-
edy appropriate to the case made by the pleadings might be
disregarded.    In 34 *Ib.*, 157, it was ruled that calling an
estate a remainder, both in the contract and in the pleadings,
when it was not a remainder, did not make it one.    The
term, it was said, was used loosely, and in what Mr. Fearne
calls a lax sense.    It thus seems that the term remainder, as
indeed most others, has more than one signification.    As
to the term indorser, while it has but one strict legal mean-
ing, it has colloquially two other meanings, in one of which
it is applied to any person who signs an instrument on the
back after another has signed it on the face, and in the other
it is a synonym for surety : "I must have an indorser,"
means not unfrequently the same as, "I must have a surety,
or some personal security."    No person is an indorser in a

strict legal sense, however else he may be bound, who has not entered into that species of contract known to the law as a contract of indorsement. The rule that there is no contribution among indorsers, and that they are bound in the order of their indorsements,, each indorsement being regarded as a separate contract, has relation to those who are indorsers in this strict legal sense, and to none others. The record we have been considering shows no contract of indorsement, no separate contract by each of the nominal indorsers, but a contract of suretyship common to them all, and on that contract the judgment was recovered. They ought to have been sued as sureties by name, not as indorsers, for the pleadings ought to describe the parties in their true legal relation to the cause of action; but a misdescription of this nature can be sacrificed without the slighest violence to the rights of the parties, whereas, the overthrow and destruction of these rights as between the co-sureties would, or might, result from sacrificing the true contract in order to preserve the false description. Form and substance are sometimes inseparable, but where they are divisible and both cannot be preserved, it cannot be doubtful which should be saved, and which suffered to perish.

Another point made in the argument was to the effect that, according to the ruling of this court in *Stiles vs. Eastman*, 1 *Ga.*, 205, the act of 1826 brought in no new rule on the subject of contribution, and that neither by that act nor by the common law were accommodation indorsers subject to contribute; and that, though the Code as construed in 46 *Ga.*, 14, renders them subject, this provision of the Code applies to no contract made prior to 1863, the year in which the Code went into effect. The last proposition is certainly true, and being so, the Code cannot be invoked on this branch of the present case. Equally inapplicable, though for a different reason, is the decision in *Stiles vs. Eastman;* for that decision has relation to indorsers proper, not to nominal indorsers who for lack

of any effective contract of indorsement could not be recovered against as indorsers proper, but only as sureties. The act of 1826 is called up by us, as it was by our predecessors when *Collins vs. Everett* was decided, for the sole purpose of making out a liability as surety where no liability as indorser had matured, or could ever mature in favor of the plaintiff in the action. We go to the act of 1826 to make Camp and Simmons and the rest sureties under circumstances where they were not actionably liable as indorsers, and having thus made them sureties, we go to the common law for the doctrine of contribution. We make no attempt to draw that doctrine from the act of 1826, nor to establish contribution between indorsers, and thus *Stiles vs. Eastman* is not in our way. True it is that the act of 1826 makes indorsers proper, as well as indorsers by mere position of signature, liable on the indorsed instrument as sureties; and, at first view, there is an apparent inconsistency in holding that, though all are alike sureties under the act of 1826, some are liable among themselves to contribution, and others not. The inconsistency is apparent only, not real; for those who are indorsers by mere position of signature, and not by contracts of indorsement proper, are bound by the original contract, and by that alone, no other having been completed; they are in effect primary parties, and that their signatures are indorsed rather than subscribed is of no consequence, except as a mark of suretyship; they are sureties in fact, though indorsers in form; another indorsement, that is, an indorsement by the payee being requisite to render their indorsements legally effective, they are sureties only. But those who have entered into complete contracts of indorsement are not sureties only; they are also indorsers. Each has entered into a several contract of indorsement, and by that he is bound. To hold that those who are sureties only are liable to contribute, and that those who are both sureties and indorsers are not liable, involves no contradiction. In making indorsers proper

Camp *vs.* Simmons.

liable at all as sureties, the act of 1826 is anomalous ; but in making formal indorsers who sign cotemporaneously with the execution of the instrument, liable directly to the payee, as primary contractors, though the instrument be negotiable not otherwise than by the payee's order, it is in line with many authorities. See 8 Metcalf, 504 ; 7 Gray, 284 ; 13 *Ib.*, 580 ; 2 Mich., 555 ; 18 Mo., 74 ; 20 *Ib.*, 571 ; 44 Me., 433 ; 11 N. H., 385 ; 10 Rich. Law, 17 ; 1 La. An., 248 ; 95 U. S., 90.

2. The parol evidence, admitted on the trial of the affidavit of illegality, went to corroborate and confirm the apparent relation of the co-sureties. It was not needed for such a purpose, and had it been objected to on that ground, perhaps it should have been excluded. Had it gone further and developed a state of facts showing that Camp and Simmons where not in *equali jure* by reason of some special circumstance, or some arrangement between themselves, and that Camp had thus no right, or only a qualified right, to contribution from Simmons, then it would have been material. The prior judgment would not have shut it out; for while that judgment was conclusive evidence of the common liability, it was but *prima facie* evidence of the *equali jure.* 1 *Ga.*, 200; 4 *Ib.*, 547. The rule excluding parol evidence to explain blank indorsements, as held prior to the Code, and which the Code, in §3808, does away with, was, we believe, never applicable to controversies respecting contribution. The right to contribution is not directly in issue when the creditor is proceeding on the evidence of debt ; and it by no means follows that because the creditor cannot be affected by parol evidence, the debtors, as between themselves, cannot be affected by it. Where the dispute is between those who are to bear the burden, and relates to how it ought ultimately to be distributed, their actual relation to one another and to the consideration of the debt can be inquired into ; and frequently this cannot be done without the aid of parol evidence.

3. The right to contribution depends on the law as it stood prior to the Code, but the suit was brought and judgment recovered after the Code went into effect, and, as controlling final process to enforce the right of contribution is matter of remedy, the Code, on this part of the present case, is applicable. Sections 2167 and 2170 are in point, and they read as follows:

§ 2167. "Any surety on the original contract, or on stay of execution, or an appeal, or in any other way, or the representative of a deceased surety, who shall have paid off or discharged the judgment, or execution, in whole or in part, and shall have the fact of such payment by him, entered on such execution by the plaintiff or his attorney, or the collecting officer, shall have the control of such execution, and the judgment upon which it is founded, to the same extent as if he was the original plaintiff therein, and be subrogated to all the rights of such plaintiff, for the purpose of reimbursing himself from his principal."

§ 2170. "All the foregoing provisions shall apply to cases where there are more than one surety, so as to enable a surety discharging the joint debt, in whole or in part, either pending the action or after joint or several judgments, to control the same against his co-sureties for the purpose of compelling them to contribute their respective shares of the amount so paid by him."

Judgment reversed.